UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DOMINICK SUTTON,

                Petitioner,

    -vs-

SUPERINTENDENT
HAROLD GRAHAM

                Respondent.

_____

**DECISION AND ORDER**
**No. 11-CV-06532(MAT)**

## I.   Introduction

*Pro se* Petitioner Dominick Sutton("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered December 27, 2006, in New York State, County Court, Erie County, convicting him, upon a jury verdict, of three counts of Murder in the First Degree (N.Y. Penal Law ("Penal Law") § 125.27[1][a][viii], 20.00), two counts of Murder in the Second Degree (Penal Law §§ 125.25[1], 20.00), two counts of Attempted Murder in the Second Degree (Penal Law §§ 110.00, 125.25[1], 20.00), and one count of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[2]).

## II.   Factual Background and Procedural History

### A.   Indictment and Pre-Trial

Erie County Indictment No. 00936-2005 charged Petitioner and co-defendant Justin Thompson ("Thompson") with three counts of Murder in the First Degree (Penal Law §§ 125.27[1][a][viii], 20.00), two counts of Murder in the Second Degree (Penal Law §§ 125.25[1], 20.00), and two counts of Attempted Murder in the Second Degree (§§ 110.00, 125.25[1], 20.00). Petitioner and co-defendant Thompson were also each charged individually with one count of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[2]). Arraignment Mins. of 05/05/2005 2-3; see also Securing Order - C.P.L. Art. 510 at Resp't Ex. A.[1] The indictment was returned in connection with the murders of Robert Brown, Tonisha Brown, Gregory Conwell ("Conwell"), and Stacie Guest ("Guest"), and the attempted murder of Diondre Brown and Walisha Walker ("Walker"), the children of Tonisha Brown.

In addition to other pre-trial motions, Petitioner filed a motion to sever his trial from his co-defendant, which was initially granted on April 13, 2006. See Decision and Order of the Erie County Court (Hon. Timothy J. Drury) dated 04/13/2006 at Resp't Ex. A. Subsequently, the People moved to reargue the severance motion on the basis that the county court had

---

[1]

Respondent did not submit a copy of the indictment with the state court records.

misapprehended the facts concerning statements made by co-defendant Thompson to certain witnesses.  <u>See</u> People's Notice of Motion to Reargue Defendants' Severance Motions and Supporting Affidavit dated April 17, 2006 at Resp't Ex. A.  After oral arguments, the county court denied severance.

### B.   Trial & Sentencing

At trial, then eleven-year-old Diondre Brown testified that he was at his home, located at 320 Koons Avenue, watching television with his mother and his sisters on April 23, 2005 when Petitioner, who he knew as Damoo, arrived to talk to his mother, Tonisha Brown. Petitioner had "dreads" in his hair and was wearing a Jamaican hat. Trial Trans [T.T.] 971-972.  Diondre Brown testified that he knew Damoo because he had previously visited his house several times to talk with his mother and play video games with him.  T.T. 968-969. Diondre Brown testified that while Damoo was at his house, Damoo shook his hand and picked up his eleven-month-old baby sister Mytavia and kissed her on the cheek.  T.T. 973.  Petitioner then went upstairs via the back entrance of the house to the upper apartment.  T.T. 974.  Shortly thereafter, Diondre Brown heard arguing and then heard eleven gunshots ring out from upstairs. T.T. 974.

Diondre Brown testified that when his mother heard the gunshots, she picked up baby Mytavia and ran outside.  T.T. 975. Diondre Brown and his eight-year-old sister, Walker, also ran

outside.  T.T. 975.  Diondre testified that, once outside, he ran
to the front porch of the house next door.  From there, Diondre saw
Petitioner, who was standing on the porch of his house, shoot his
mother while she was carrying baby Mytavia.   T.T. 977-978.
According to Diondre Brown, Petitioner then shot at him and at
Walker.  T.T. 978.

Diondre Brown testified that after his mother was shot, he saw
co-defendant Thompson exit 320 Koons Avenue and heard him say to
Petitioner, "come on, let's go."  T.T. 983-984.  Petitioner and
co-defendant Thompson, who were both carrying guns, entered a black
Chevy Lumina, which Diondre recognized as belonging to co-defendant
Thompson.  T.T. 983-984, 1034.

A police investigation of the crime scene shortly after the
shootings revealed that Robert Brown, Guest, and Cornwell had been
shot to death in the upper apartment of 320 Koons Avenue.  Diondre
Brown's mother, Tonisha Brown, had been shot to death outside her
home.  Walker suffered a non-fatal gunshot wound to her hand.
T.T. 1175.

Robin Brown, Tonisha Brown's mother, testified that she knew
Petitioner and co-defendant Thompson for "maybe five or six years"
and that both visited 320 Koons Avenue frequently.  T.T. 1164.
Robin Brown testified that, at the time of the shooting incident,
she was across the street at her friend's house when she heard
gunshots, screaming, and then a car "screeching off."  T.T. 1175.

-4-

Robin Brown went outside and saw Diondre Brown on her friend's porch, saying, "they shot my mommy."  T.T. 1175.  Robin Brown testified that she ran to Walker, who stated, "I think I got hit" and then showed Robin Brown her bloody hand.  T.T. 1175.  Robin Brown then ran to her daughter, who was lying on the ground outside between two houses with "a bullet hole in her neck."  Baby Mytavia was sitting between her mother's knees.  T.T. 1176.  Robin Brown picked up the baby and then started screaming for help.  Shortly thereafter, the police arrived.  At this point, worried that something had happened to her brother, Robert Brown, Robin Brown ran back into the house and to the upper apartment.  T.T. 1178. There, she observed her brother and Guest laying dead on the floor. Robin Brown collapsed and started screaming.  T.T. 1179.  The police eventually transported Robin Brown to the station where she later gave a statement.  T.T. 1181.

James Webb ("Webb") testified that he knew Petitioner from being incarcerated with him at the county jail.  T.T. 1935. According to Webb, because there were only four people in their cell block, Petitioner and Webb began talking about their respective cases.  T.T. 1939.  Webb testified that, during one of their conversations, Petitioner, in explaining his role in a shooting, stated, "I did that bitch dirty up close and personal." T.T. 1943.  Petitioner told Webb that he shot a female and that he had shot her within two to three feet away.  Petitioner also told

Webb that, at the time of the shooting, he was wearing a hat that had dreadlocks attached to it.  T.T. 1943.  Additionally, he told Webb that there had been one witness to the shooting and that this one witness was a young boy whom he had known before the shooting, as he had been to this particular boy's house on Koons Avenue "plenty of times."  T.T. 1945.  Petitioner told Webb that he took $4,000 from one of the victim's pockets, but that this money was confiscated by the police when he was arrested.  T.T. 1947.  Webb testified further that Petitioner told him that, after the shooting, he went to "his neighbor's house in the projects, like a door or two away from his baby's mother's house" and, while there, cut his hair.  T.T. 1952-1953.  Webb testified that he hoped to possibly receive a "deal" from the prosecution on his pending robbery conviction in exchange for his testimony, but that no deal had been made.  T.T. 1957.

Buffalo Police Department Homicide Detective Mark Stambach testified that he interviewed Petitioner after the murders at 320 Koons Avenue.  T.T. 1623-1624.  Detective Stambach testified that when he asked Petitioner if he "hurt" anyone at 320 Koons, Petitioner nodded his head, indicating he had.  T.T. 1638. Petitioner also nodded his head in the affirmative when Detective Stambach asked him if anything went wrong at 320 Koons, whether he had shot anyone at 320 Koons, and when asked, "did you shoot your way out of 320 Koons?"  T.T. 1641-1644.

Lisa Rivera ("Rivera") testified that she knew co-defendant Thompson "almost a year" before the date of the murders, and that she had a relationship with him during that time.   T.T. 1290. Rivera testified that, around April of 2005, co-defendant Thompson drove a black Lumina and that she had been a passenger in it "more than a dozen times."   T.T. 1290-1291.   Rivera also testified that prior to the date of the murders, Robin Brown had told her "not to mess" with co-defendant Thompson because the Secret Service was looking for him and that they had been to her house and would probably come to Rivera's house next.   Rivera testified that when she told co-defendant Thompson what Robin Brown had told her, he said, "[t]hose motherfuckers snitching.   I'm going to kill all of them motherfuckers."   T.T. 1297.   According to Rivera, after the murders, co-defendant Thompson came to her house and told her that he paid someone to commit the murders at 320 Koons.   T.T. 1303-1305.   The two continued their conversation and co-defendant Thompson proceeded to tell Rivera that he had shot Conwell, "some girl," and Robert Brown, recounting the details of the shootings. T.T. 1306-1310.   Rivera also testified that Petitioner asked her to be an alibi witness for him, but that she declined.   T.T. 1309-1310.

Forensic specialist Michael Dujanovich ("Dujanovich") testified that the bullets removed from Tonisha Brown were consistent with .22 caliber class bullets.   T.T. 2041.   He also

testified that the bullets removed from the three other victims upstairs at 320 Koons Avenue were consistent with .9mm caliber bullets.  T.T. 2042-2058.

At the close of the trial, Petitioner was found guilty as charged, and subsequently sentenced to life imprisonment without parole.  T.T. 2370-2371; Sentencing Mins. [S.M.] 15-17.

### D.    The Direct Appeal

Through counsel, Petitioner appealed his judgment of conviction in the Appellate Division, Fourth Department on the following grounds: (1) that he was entitled to a new trial because county court refused to sever his trial from co-defendant Thompson; (2) that his constitutional speedy trial rights were violated when the county court refused to let him go to trial separately; (3) the jury's verdict was not supported by legally sufficient evidence and was contrary to the weight of the evidence;  (4) that Petitioner was entitled to a new trial due to juror misconduct; and (5) the sentence was unduly harsh and severe.  See Resp't Ex. B.  The Appellate Division, Fourth Department unanimously affirmed the judgment of conviction, and leave to appeal was denied.  People v. Sutton, 71 A.D.3d 1396 (4th Dep't 2010); lv. denied, 15 N.Y.3d 778 (2010).

### E.    The Federal Habeas Proceeding

On or about October 26, 2011, Petitioner filed the instant habeas corpus petition, seeking relief on the same five grounds he

raised on direct appeal. <u>See</u> Pet. ¶ 12, Points One-Five, Appendices A-B. Before Respondent answered, Petitioner moved to stay his petition on the basis that he needed to "exhaust certain issues that were raised" and intended to add new issues. Dkt. No. 6. In a Decision and Order dated January 13, 2012, the Court (Hon. Charles J. Siragusa) denied the request for a stay without prejudice. Prior to the denial, however, the Court permitted the parties to address the issues raised by Petitioner's request. Dkt. No. 7 at p 3. The Court directed Petitioner to respond to the Order, "addressing whether a stay is necessary and appropriate in this action." <u>Id.</u> The Court also instructed Petitioner that, "[i]f [he] intends to amend his petition to include additional claims that are not yet exhausted, he is directed to submit a proposed amended petition, including all of the claims by which he seeks to challenge the conviction, both exhausted and unexhausted." <u>Id.</u>

Petitioner has now submitted a renewed motion for a stay on the basis that he is "in the process of raising an [a]ctual [i]nnocence claim" in state court. Dkt. No. 8. Petitioner did not submit a proposed amended petition; however, he requests that the Court hold his petition in abeyance "so [he] can amend it," presumably to include the actual innocence claim. <u>Id.</u> On February 29, 2012, Respondent file a Response and supporting Memorandum in opposition to the habeas petition. Dkt. No. 10. Respondent's

opposition papers address the five claims raised in the habeas petitition, but do not address Petitioner's stay request.

A district court, confronted with a mixed petition containing exhausted and unexhausted claims, has the power to stay consideration of a state prisoner's petition for a writ of habeas corpus in order to permit the prisoner to exhaust his unexhausted claims. Rhines v. Weber, 544 U.S. 269 (2005); Zarvela v. Artuz, 254 F.3d 374 (2d Cir. 2001). The granting of such stay is not a matter of course.

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

Rhines, 544 U.S. at 277. Petitioner has failed to meet this standard.

With regard to the "good cause" prong, Petitioner has failed to allege any reason whatsoever for failing to bring the claim sooner.

Petitioner has also failed to establish that his new actual innocence claim is not plainly meritless.[2]   "'Actual innocence' itself is not a free-standing cognizable ground for habeas relief." See Russell v. Rock, 2008 U.S. Dist. LEXIS 102699, 2008 WL 5333327, at *5 (E.D.N.Y. Dec. 19, 2008) (dismissing petitioner's claim of actual innocence); Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) ("Claims of actual innocence . . . have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").   Even if the claim was cognizable, Petitioner has not pointed to any evidence or alleged any facts to substantiate a claim of actual innocence. Accordingly, the Court finds no reason to stay consideration of the petition while petitioner exhausts an additional claim of actual innocence, and no reason to permit him to amend his petition to assert said claim.   Petitioner's renewed motion to stay (Dkt. No. 8) is therefore denied.

---

[2]

Because a motion to amend a habeas corpus petition is governed by Fed.R.Civ.P. 15, Littlejohn v. Artuz, 271 F.3d 360, 363 (2d Cir. 2001), the futility of the proposed claims not only justifies the denial of petitioner's motion to stay, it also warrants denial of the motion to amend the petition. Sookoo v. Heath, 09 Civ. 9820 (JGK), 2011 U.S. Dist. LEXIS 143627, 2011 WL 6188729 at *3 (S.D.N.Y. Dec. 12, 2011) (Koeltl, D.J.); Ayala-Heredia v. Exec. Office U.S. Marshals, 11-CV-1072 (RRM)(LB), 2011 U.S. Dist. LEXIS 84764, 2011 WL 3348226 at *4 (E.D.N.Y. Aug. 02, 2011); Ortiz v. Heath, 10-CV-1492 (KAM), 2011 U.S. Dist. LEXIS 37336, 2011 WL 1331509 at *5 (E.D.N.Y. Apr. 6, 2011); Cordova-Diaz v. Brown, 10 Civ. 5133 (CM)(KNF), 2011 U.S. Dist. LEXIS 12437, 2011 WL 723575 at *4 (S.D.N.Y. Feb. 7, 2011) (K.N. Fox, M.J.); Peralta v. Connelly, 06 Civ. 5360 (DAB), 2010 U.S. Dist. LEXIS 82738, 2010 WL 3219326 at *5 (S.D.N.Y. Aug. 11, 2010) (Batts, D.J.) (adopting Report & Recommendation of Dolinger, M.J.)

The Court now proceeds to resolution of the original habeas petition.  For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied and the habeas petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).  Even where, as here, a respondent does not challenge a petitioner's claims on exhaustion grounds, the Court has an independent obligation to ensure that this requirement has been met, unless expressly waived by the State. See 28 U.S.C. § 2254(b)(3).  The Court finds that all of Petitioner's claims, with the exception of his harsh and excessive sentencing claim, are exhausted and properly before this Court.

-12-

**IV.  The AEDPA Standard of Review**

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

**V.  Analysis of the Petition**

**1.  Ground One - Severance**

Petitioner claims, as he did on direct appeal, that the trial court improperly denied his motion to sever his trial from his co-defendant.  Specifically, Petitioner argues that "[he] was entitled to a separate trial from his co-defendant due to antagonistic [and] irreconcilable defenses."[3]  The Appellate Division rejected this claim on the merits.[4]  Sutton, 71 A.D.3d at

---

[3]

Petitioner also claims that he was entitled to a separate trial due to "speedy trial limitations."  Pet., Appendix B at p 1.  The speedy trial issue, which implicates a different legal analysis from the instant one, is addressed *infra* at section IV, 2.

[4]

The Appellate Division found as follows: "[w]ith respect to the merits, we conclude that the court neither abused or improvidently exercised its discretion in denying the motion for severance.  As we stated in our decision affirming the judgment convicting the codefendant of the same crimes, the court properly

1397.  As discussed below, this claim is meritless and does not warrant habeas relief.

"To grant federal habeas corpus relief on the basis of an improper denial of severance, a federal court must find that the joinder was so prejudicial as to deny the petitioner a fair trial." Boddie v. Edwards, No. 97 Civ. 7821 MGC, 2005 U.S. Dist. LEXIS 6714, 2005 WL 914381, *7 (S.D.N.Y. April 20, 2005) (citing Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990)).  "By contrast, '[i]ncidental prejudice, which is almost always present when multiple defendants who played different roles are tried together, will not be enough.'" Id. (quoting Mercedes v. Herbert, 01 Civ. 1359(DC), 2002 U.S. Dist. LEXIS 7766, 2002 WL 826809, at *5 (S.D.N.Y. Apr. 29, 2002).  A petitioner must therefore establish that he was "severely prejudiced," and not merely "that he might have had a better chance for acquittal at a separate trial."   Grant, 921 F.2d at 31 (internal quotation omitted).  "A separate trial is required only upon a showing that 'the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.'"

---

concluded that the core of each defense was not in irreconcilable conflict with the other, and we likewise conclude that there was no violation of defendant's rights under Bruton v United States (391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 [1968]) or Crawford v Washington (541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 [2004]).  Contrary to defendant's contention, the codefendant's inculpatory statements implicated defendant only when linked with other evidence introduced at trial and thus severance was not required."  Sutton, 71 A.D.3d at 1397 (internal citations and quotations omitted).

Boddie, 2005 U.S. Dist. LEXIS 6714, 2005 WL 914381 at *7 (quoting

Grant, 921 F.2d at 31).

Moreover, "[t]here is a strong presumption of a joint trial

where two (or more) defendants are charged with having committed

the same crime." Castro v. Fisher, No. 04 Civ.0346 DLC AJP, 2004

U.S. Dist. LEXIS 13976, 2004 WL 1637920, *18 (S.D.N.Y. July 23,

2004) Report and Recommendation adopted, 2004 U.S. Dist. LEXIS

22527, 2004 WL 2525876 (S.D.N.Y. Nov. 8, 2004). As the Supreme

Court has reasoned:

> [i]t would impair both the efficiency and the
> fairness of the criminal justice system to
> require . . . that prosecutors bring separate
> proceedings, presenting the same evidence
> again and again, requiring victims and
> witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly
> favoring the last-tried defendants who have
> the advantage of knowing the prosecution's
> case beforehand. Joint trials generally serve
> the interests of justice by avoiding
> inconsistent verdicts and enabling more
> accurate assessment of relative
> culpability-advantages which sometimes operate
> to the defendant's benefit. Even apart from
> these tactical considerations, joint trials
> generally serve the interests of justice by
> avoiding the scandal and inequity of
> inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987).

Here, Petitioner has not made a showing of substantial

prejudice which would entitle him to habeas relief. Petitioner

failed to explain how or in what way his defense was antagonistic

or irreconcilable with his co-defendant's. Instead, he relies upon

the generalized allegation that he was entitled to a separate trial because "the evidence presented against his co-defendant . . . would 'spill over' into his own defense of innocen[c]e and that Mr. Thompson's attorney . . . would act as a 'second prosecutor' against him while proving his client's defense." Pet., Appendix B at p 1. The Court finds this contention unpersuasive and unsupported by the record, which shows that Petitioner's and Thompson's defenses were neither antagonistic nor irreconcilable. Petitioner's defense to the charges was premised on the lack of evidence presented by the prosecution as well as his lack of a motive to commit the murders. Co-defendant Thompson's defense to the charges was that young Diondre Brown had wrongly identified co-defendant Thompson as one of two armed men seen exiting 320 Koons Avenue after the murders, and that the witness Rivera's dubious character rendered her testimony unreliable. Notably, neither Petitioner nor Thompson accused the other of having committed the murders alone or as having acted as the lone gunman.

Moreover, in its final jury instruction, the trial court explicitly stated to the jury that "[it] must consider the counts against the defendants individually and individually as to each defendant. It's for you to decide whether the People have shown from the evidence at the trial to your satisfaction beyond a reasonable doubt the defendant's guilt as to each count of the indictment." T.T. 2311-2312. The trial court elaborated on this

-16-

instruction, explaining that, "[y]ou are to consider whether the People have proven beyond a reasonable doubt the guilt of the defendants separately as to each individual count, as to each defendant.  Your verdict on one count does not control your verdict on any other count of the indictment."  T.T. 2312.  And, later in the jury instruction, the trial court again emphasized to the jury that, "[i]t is your obligation to evaluate the evidence as it applies or fails to apply to each defendant separately."  T.T. 2339.

Accordingly, the Appellate Division's rejection of this claim did not run afoul of established Supreme Court law, and habeas relief is therefore denied.

## 2.   Ground Two - Speedy Trial

Petitioner claims, as he did on direct appeal, that the trial court's decision to proceed with a joint trial violated his constitutional right to a speedy trial.  See Pet., Appendix A at p 1, Appendix B at p 1.  The Appellate Division denied this claim.[5]

---

[5]

In denying this claim, the Appellate Division held as follows: "[e]ven assuming, arguendo, that defendant preserved for our review his further contention that he was denied his constitutional right to a speedy trial based on the court's denial of his severance motion, we conclude that defendant's contention lacks merit."  Sutton, 71 A.D.3d at 1397.  Given the Appellate Division's determination that the claim was not preserved for appellate review, it would appear that the claim is subject to procedural default in the instant proceeding.  Respondent, however, did not raise the affirmative defense of procedural default in its opposing papers, and, instead, addressed the claim on the merits.  Consequently, Respondent has waived the affirmative defense of procedural default.  See e.g., Mellerson v. Rock, No. 08-CV-6050(VEB), 2011 U.S. Dist. LEXIS 33002, 2011 WL 1198199 at *15 (W.D.N.Y. March 29, 2011) ("Respondent has failed to address th[e] procedural bar and, instead of arguing that the claim is procedurally defaulted, has addressed the substance of the claim.  Thus, Respondent has waived the affirmative defense of procedural

Sutton, 71 A.D.3d at 1397.  As discussed below, this claim is meritless and does not warrant habeas relief.

The Supreme Court has established that the right to a speedy trial is a "fundamental" right under the Sixth Amendment, and is made applicable to the States by the due process clause of the Fourteenth Amendment.  Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  No time is set forth in the Constitution within which a trial is necessarily considered timely.  See Barker v. Wingo, 407 U.S. 514, 523 (1972). However, a court must balance the following factors to determine whether a violation of the right to a speedy trial has occurred: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant.  See Barker, 407 U.S. at 530.  No one factor is necessary or sufficient to find that a speedy trial violation has occurred; but all these are factors to be considered with other relevant circumstances.  See id.; see also Flowers v. Warden, Connecticut Correctional Institution, 853 F.2d 131, 132-33 (2d Cir. 1988).

---

default.");   Dennis v. Corcoran, No. 07-CV-6229(VEB), 2010 U.S. Dist. LEXIS 129028, 2010 WL 5072124 at *6, n.7 (W.D.N.Y. Dec. 7, 2010) ("Respondent has not asserted the affirmative defense of procedural default in connection with this claim, and therefore has waived it.");   Lyons v. Conway, No. 9:03-CV-503 (NAM/RFT), 2006 U.S. Dist. LEXIS 74742, 2006 WL 2847281 at *4 (N.D.N.Y. Sept. 30, 2006) ("However, respondent has not raised Lyons' procedural default as an affirmative defense to this portion of Lyons petition. Therefore, respondent has waived this potential argument in opposition to this aspect of Lyons' claim for relief.").  Because Respondent has waived the affirmative defense of procedural default and addressed the claim on the merits, the Court reviews the claim on the merits.  Insofar as the Appellate Division alternatively adjudicated the claim on the merits, the Court applies the deferential AEDPA standard.

In this case, Petitioner was arrested on April 24, 2005 and was tried some eighteen months later on October 12, 2006. See Certificate of Conviction-Imprisonment at Resp't Ex. A; T.T. of 10/12/2006. Based on the record before this Court, it appears that the delay was occasioned by the particular manner in which co-defendant Thompson's attorneys decided to conduct Thompson's defense. Mins. of 08/29/2006 2-3, 6-7. Although Petitioner's attorney and the trial court did express speedy trial concerns when discussing whether to try Petitioner and Thompson jointly when Petitioner was ready for trial and Thompson was not, Petitioner did not formally assert his right to a speedy trial at any point in the proceedings. Id. In any event, Petitioner has not demonstrated any specific prejudice he suffered as a result of the eighteen month delay, nor is any apparent to this Court. The Second Circuit has found pre-trial delays of longer durations -- e.g., twenty months and twenty-six months -- excusable. See Wilson v. Henderson, 584 F.2d 1185, 1192 (2d Cir. 1978); United States ex rel. Spina v. McQuillan, 525 F.2d 813, 816 (2d Cir. 1975). Thus, the Court finds that the eighteen month delay in the commencement of Petitioner's trial, occasioned by the reasons and circumstances noted above, was not violative of his constitutional right to a speedy trial. Thus, it cannot be said that the state court's adjudication of this claim contravened or unreasonably applied settled Supreme Court law. The claim is therefore denied.

3.   **Ground Three - Juror Misconduct**

Petitioner claims, as he did on direct appeal,[6] that the trial court erred in failing to grant his motion for a mistrial based on juror misconduct.  <u>See</u> Pet., Appendix B at p 3.  This claim is meritless.

The Sixth Amendment provides that a criminal defendant has the right to a trial by an impartial jury.  <u>Reynolds v. United States</u>, 98 U.S. 145, 154 (1879).  That right is compromised when the trier of fact is unable to render a disinterested, objective judgment. The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  <u>Smith v. Phillips</u>, 455 U.S. 209, 215 (1982);  <u>accord</u> <u>Remmer v. United States</u>, 347 U.S. 227, 229-30 (1954) ("The trial court . . . should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.").

The handling of possible juror partiality or misconduct "is entrusted to the sound discretion of the trial court."  <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 813 (2d Cir. 2000) (quoting

---

[6]

The trial court denied this claim on the merits, finding that: "[c]ontrary to the further contention of defendant, a new trial is not warranted based on juror misconduct.  When defense counsel alleged that two jurors were improperly deliberating before the court issued its final instructions, the court then interviewed those jurors.  We see no basis to disturb the court's determination to credit the jurors' statements denying any improper conduct."  <u>Sutton</u>, 71 A.D.3d at 1398 (internal citations and quotations omitted).

United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994)).  "On
§ 2254 review, the state trial court is entitled to a presumption
of correctness with respect to its conclusion that the jury was
impartial."  Id.  "[T]he Supreme Court has made it clear that the
'trial court's findings of impartiality [may] be overturned only
for manifest error.'"  Id. (quoting Knapp v. Leonardo, 46 F.3d 170,
176 (2d Cir.1995) (alteration in original)).  There must be "fair
support in the record for the state court['s] conclusion that the
jurors here would be impartial."  Patton v. Yount, 467 U.S. 1025,
1038 (1984).

Here, the record reflects that after defense counsel's closing
statement, the trial court recessed for lunch.  When court
reconvened, defense counsel alerted the court that, during the
lunch recess, he had heard two jurors -- nos. 3 and 8 -- discussing
his closing argument, and stated that a "mistrial needs to be
declared."  T.T. 2233.  In response, the trial court questioned
jurors 3 and 8 with respect to defense counsel's allegations.
T.T. 2234.  Both jurors stated that they had abided by the trial
court's instructions and had not discussed the case.  T.T. 2234-
2238.  When asked by the trial court if she had "heard the other
jurors talk about the case at all," juror no. 8 specifically
stated, "[n]ot anything that I don't think we're not supposed to.
Silly, laughing things, but nothing pertaining to evidence or
anything like that.  I mean, personal mannerisms or something we

might have made fun of, but nothing like about anything except that." T.T. 2237. After the court questioned jurors 3 and 8, defense counsel indicated to the court that he may have confused juror no. 8 with juror no. 10. T.T. 2295. To be sure, the court questioned juror no. 10 and asked her if she had discussed the case, to which she responded in the negative. T.T. 2297. After the trial court questioned her, defense counsel indicated that it was, in fact, juror no. 8 he had heard discussing the case, not juror no. 10. He then requested that the trial court replace jurors 3 and 8. T.T. 2298. The trial court judge denied the defense's request, stating that "I don't see a basis to move those jurors, and the motion for a mistrial and motion to remove the [jurors] are denied." T.T. 2299.

The state court's decision allowing jurors 3 and 8 to remain and denying a mistrial after having conducted a pointed inquiry of said jurors -- who both stated that they had not discussed the case -- was not contrary to or an unreasonable application of clearly established Federal law. See Smith, 455 U.S. at 215. Thus, Petitioner's claim that the Court should have declared a mistrial based upon the misconduct of jurors 3 and 8 is meritless and is denied.

## 4.  Ground Four - Legal Sufficiency & Weight of the Evidence

Petitioner argues, as he did on direct appeal, that the evidence was legally insufficient to support his conviction and

that the verdict was against the weight of the evidence.  The
Appellate Division rejected these claims on the merits.[7]  Sutton,
71 A.D.3d at 1397-98.  For the reasons discussed below, neither of
these claims warrant habeas relief.

### (A)  Legal Insufficiency

Petitioner claims, as he did on direct appeal, that the
evidence was legally insufficient to support his conviction for the
three upstairs murders (Robert Brown, Guest and Cornwell).[8]
Specifically, he claims that "[t]he key element of 'shared intent'
was not shown" with respect to those murders.  Pet., Appendix B at
p 2.  He asserts further that the People failed to establish his
motive to commit the murders, and that there was "no physical,
forensic, or medical evidence direct[ly] link[ing] him to the scene
of the crime or the [shootings] of the victims."  Id.  Petitioner
claims that, "[a]t best, [his] presence at the scene of the crime

---

[7]

The Appellate Division determined that: "[c]ontrary to the contention of
defendant, the conviction is supported by legally sufficient evidence.  In
addition, viewing the evidence in light of the elements of the crimes as charged
to the jury, we conclude that the verdict is not against the weight of the
evidence."  Sutton, 71 A.D.3d at 1397-98 (internal citations omitted).

[8]

To reiterate, the first four counts of the indictment charged Petitioner
and co-defendant Thompson, each being intentionally aided by the other, with:
murder in the second degree (with respect to victim Robert Brown) (count 1),
murder in the first degree (with respect to Robert Brown as the primary victim
and Guest as the secondary victim) (count 2), murder in the first degree (with
respect to Robert Brown as the primary victim and Cornwell as the secondary
victim) (count 3), and murder in the first degree (with respect to Robert Brown
as the primary victim and Tonisha Brown as the secondary victim) (count 4).  T.T.
2312.

rests upon inconsistent testimonies of the People['][s] witnesses." Id. This claim is meritless.

When considering the legal sufficiency of the evidence, the court "must look to state law to determine the elements of the crime," Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d. Cir. 2002) (citation omitted); see also Langston v. Smith, 630 F.3d 310, 314 (2d Cir. 2011), and determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Rivera v. Cuomo, 649 F.3d 132, 137 (2d Cir. 2011). A reviewing court faced with a record of historical facts that supports conflicting inferences must presume that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. See Jackson, 443 U.S. at 326. Moreover, when challenging the legal sufficiency of the evidence in a state criminal conviction, the petitioner "bears a heavy burden," Ponnapula, 297 F.3d at 179, of "rebutting [by clear and convincing evidence] the presumption that all factual determinations made by the state court were correct." Farrington v. Senkowski, 214 F.3d 237, 241 (2d Cir. 2000) (citing 28 U.S.C. § 2254(e)).

Under New York law, a person is guilty of murder in the second degree when "with intent to cause the death of another person, he

causes the death of such person . . . ." Penal Law § 125.25[1]. A person is guilty of murder in the first degree, in relevant part, when: "[w]ith intent to cause the death of another person, he causes the death of such person . . . and as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons . . . ." Penal Law § 125.27[1][a][viii].   Each charge under Penal Law § 125.27[1][a][viii] involves a primary victim whose death is the result of an intent to kill and an additional victim whose death as part of the same transaction is the result of either an intent to kill or an intent to cause serious physical injury or death. Moreover, in New York, a person may be criminally liable for the conduct of another:

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

Penal Law § 20.00.

Upon a review of the record, it is clear that the evidence produced at trial was sufficient for the jury in this case to reasonably infer that Petitioner, acting in concert with co-defendant Thompson, had the intent to cause the deaths of the upstairs victims (Robert Brown, Guest and Cornwell). Although the

proof at trial established that Thompson fired the shots that caused the deaths of Robert Brown, Guest and Cornwell, a jury could have reasonably concluded that Petitioner was an active and willing participant in those murders. Specifically, the evidence at trial established that: on April 23, 2005, Petitioner visited Tonisha Brown at her home at the lower apartment at 320 Koons Avenue and, after briefly visiting with Diondre Brown and baby Mytavia, went to the upstairs apartment where Robert Brown lived; shortly thereafter, gunshots were fired; once the gunshots rang out from upstairs, Tonisha Brown, baby Mytavia, Diondre Brown and Walker exited the home; once outside, Petitioner shot Tonisha Brown, and then shot at Diondre Brown and Walker; shortly thereafter, Thompson emerged from 320 Koons Avenue and shouted to Petitioner, "come on, let's go"; both men then entered Thompson's black Chevy Lumina and drove off; and that both Petitioner and Thompson carried guns. The physical evidence established that all of the victims died of gunshot wounds; the bullets removed from Tonisha Brown were consistent with .22 caliber bullets and the bullets removed from the three upstairs victims were consistent with .9mm caliber bullets. After the murders, the police confiscated $3,880 from Petitioner, which, according to Webb, Petitioner took from one of the murder victims. Also after the murders, Petitioner admitted to police that "things went wrong at 320 Koons" and that he "had to shoot his way out of 320 Koons." T.T. 975, 978, 983-984, 2042-

2058.  Given all of the evidence presented at trial, a reasonable juror could have found Petitioner guilty of the murders of the upstairs victims (Robert Brown, Guest and Cornwell).  To the extent Petitioner claims that the proof at trial was legally insufficient because the People failed to establish a motive for the murders, said claim is meritless.  Petitioner's motive is not an element of first or second degree murder –- or an element of any of the crimes of which he was convicted for that matter –- and the prosecution therefore did not have the burden of proving motive.

Accordingly, the state court's denial of Petitioner's claim was not contrary to, or an unreasonable application of, the <u>Jackson</u> standard.  Petitioner has not met the burden of showing that no rational trier of fact could have found him guilty beyond a reasonable doubt.  The claim is therefore denied.

**(B)  Weight of the Evidence**

Petitioner's assertion that his conviction was against the weight of the evidence is not cognizable on habeas review.  A weight of the evidence claim is "an error of state law, for which habeas review is not available."  <u>Douglas v. Portuondo</u>, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002); <u>Correa v. Duncan</u>, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15[5]"); <u>see also</u> <u>Maldonado v. Scully</u>, 86 F.3d at 35 ("assessments of the weight of the evidence . . . are for the jury

and not grounds for reversal on appeal"). Thus, Petitioner's weight of the evidence claim is denied for failure to state a cognizable constitutional question.

In sum, Petitioner's claims that the evidence was legally insufficient to support his conviction and the verdict was against the weight of the evidence provide no basis for habeas relief. The claims are therefore denied.

### 5.   Ground Five - Harsh & Excessive Sentence

Petitioner argues that his sentence of life without parole was harsh and excessive. See Pet., Appendix A at p 2, Appendix B at p 3. The Appellate Division rejected this claim on the merits, finding that "the sentence is not unduly harsh or severe." Sutton, 71 A.D.3d at 1398. As discussed below, this claim does not warrant habeas relief.

#### A.   Harsh and Excessive Sentence

In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). When Petitioner appealed his sentence in the state courts, he urged the Appellate Division to exercise its discretionary authority under state law (N.Y. Crim. Proc. Law ("CPL") § 470.15[6]) to reduce his sentence in the interest of justice. See Pet'r Br. on Appeal, Point V at Resp't Ex. A. Thus, Petitioner's sentencing claim, based solely on state law, is not appropriate for federal habeas review.

The Second Circuit has held that no federal constitutional issue amenable to habeas review is presented where, as here, the sentence is within the range prescribed by state law. <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>Fielding v. LeFevre</u>, 548 F.2d 1102, 1108 (2d Cir. 1977); <u>Underwood v. Kelly</u>, 692 F. Supp. 146 (E.D.N.Y. 1988), <u>aff'd</u>, 875 F.2d 857 (2d Cir.), <u>cert. denied</u>, 493 U.S. 837 (1989). Petitioner was convicted of, *inter alia*, three counts of Murder in the First Degree. New York's sentencing statute provides for life imprisonment without parole upon conviction of murder in the first degree. <u>See</u> Penal Law §§ 70.00(5), 125.27. Because Petitioner's sentence falls within the prescribed statutory scheme, his claim does not present a federal constitutional issue cognizable on habeas review. <u>Accord, e.g.,</u> <u>Peppard v. Fischer</u>, 739 F. Supp.2d 303, 309 (S.D.N.Y. 2010) (collecting cases).

**B.    The Eighth Amendment - Cruel & Unusual Punishment**

To the extent, if any, Petitioner raises an Eighth Amendment claim in the instant petition, the Court finds said claim unexhausted because the constitutional nature of the claim was not "fairly presented" to the state courts on direct appeal. When Petitioner raised this claim on direct appeal, he invoked the appellate court's discretionary authority to reduce the sentence in the interest of justice. <u>See</u> Pet'r Br. on Appeal, Point V at Resp't Ex. A. Courts in this district have found that a prisoner's

reliance on a state procedural law granting courts discretionary authority to reduce sentences does not "fairly present" his or her constitutional claim in state court. Accord, Better v. Conway, 778 F. Supp. 2d 339, 2011 U.S. Dist. LEXIS 43141, 2011 WL 1518696, at *8 (S.D.N.Y. 2011) (citing King v. Cunningham, 442 F. Supp.2d 171, 181 (S.D.N.Y. 2006) (citations omitted)). Because Petitioner could return to state court and file a motion pursuant to CPL § 440.20 to set aside the sentence on the ground that it is unconstitutional, his Eighth Amendment claim -- to the extent he raises such -- remains unexhausted.

Petitioner's failure to exhaust the Eighth Amendment claim is not fatal to this Court's disposition of his application on the merits. Because the Court finds the claim to be wholly meritless, it has the discretion to dismiss the petition notwithstanding Petitioner's failure to exhaust. See 28 U.S.C. § 2254(b)(2); Pratt v. Greener, 306 F.3d 1190, 1197 (2d Cir. 2002).

The Supreme Court has articulated a principle of "gross disproportionality" for measuring whether a prisoner's sentence violates the Eighth Amendment proscription against "cruel and unusual punishment." E.g., Harmelin v. Michigan, 501 U.S. 957 (1991); Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263 (1980). Only extreme sentences that are grossly disproportionate to the crimes for which they are imposed can be said to violate the Eighth Amendment. See id.; see also

United States v. Snype, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare).   Applying the Supreme Court's precedent on this issue, the Court finds that this case does not present one of those rare and extreme circumstances in which the Supreme Court contemplated intervention by a reviewing court into a state's sentencing decision.   The record reflects that the court imposed the life without parole sentence because of the particularly heinous nature of the crime.   S.M. 8, 10-11.   The sentencing judge acknowledged, on the record, that "[he] [had] strong feelings about the wisdom of life without parole," but that given Petitioner's role in the execution-style killings involving numerous victims, "[Petitioner] merit[ed] it . . . ." S.M. 14.   In meting out Petitioner's punishment, the sentence judge characterized Petitioner's actions as "depraved" and "despicable" and explained that "[Petitioner] stepped way beyond human conduct, even as among murderers."   S.M. 15.

Accordingly, Petitioner's sentencing claim provides no basis for habeas relief and the claim is therefore denied.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.   Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right,"

28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      September 17, 2012
            Rochester, New York